May it please the Court, Gail Ivins, appearing on behalf of Valerie Komisarek, and unless the Court has questions, I'd like to defer my time to co-counsel. Okay. Thank you. May it please the Court, James Crawford, on behalf of Alexander Latyshev. Essentially, I want to submit on my arguments as well. However, if I may, I would like to—one of the arguments in our opening brief was concerning Blakely and Booker, and at this time we'd like to withdraw that argument. And in addition, I would request permission to join in Mr. Komisarek's argument on the conflicting instructions. What other can I— Wait. Just a second. Which one's your client? Alexander Latyshev. Okay. And you have Booker Blakely. And you're withdrawing that, okay. Yes, Your Honors. I've consulted with the client. He's been released, and he's on community supervision, so there's no need to proceed with even a limited remand if you were to be entitled to it. So this is O-L-E-K-S-A-N-D-R. O-L-E-K-S-A-N-D-R. Okay. So he's been released, and you're withdrawing Booker. And which argument are you joining—you want to join? I would like to, with the permission of the Court, join in Mr. Komisarek's argument dealing with the constructing—conflicting, excuse me, jury instructions on the alias smuggling counts. Okay. Thank you. Thank you, Your Honors. May it please the Court, Alton and on behalf of Serge Mizoritsky, Your Honor, the only issue that we raised was the Booker-Fan-Fan issue. After discussion with the government, they agree that under the teachings of the Enbank case in Amman Line, as well as under United States v. Wing, that the plain error test has been met and that the case should be remanded on a limited remand back to the trial court. As that is the relief we are seeking, we would have no further argument. Okay. Good morning, Your Honors. May it please the Court. I'm Jay Lichtman. I represent Titania Komisarek. I will take a little bit more of your time than my co-counsel. I'd like to first, and if it's possible, I'd like to reserve three minutes for rebuttal. Please watch your time. Thank you. I'd like to first address the wiretap issue. As we've contended, we believe there was a Franks violation for the government or for the affluent omitting material facts from the affidavit. And we know this because there were interview reports done of the various cooperators. And looking at those interview reports and comparing them to the warrant affidavit, we see the omissions that were not or facts that were not included in the affidavit, which were in the interview reports. And so if you take the information that was omitted and place it in the affidavit, we believe that it showed a lack of necessity. And the government bears the burden of demonstrating necessity, and we believe they haven't done that in this case. Which omissions were those? Specific omissions. There's a witness, and I may have some difficulty with the Russian names, but Sinevich. Sinevich was a woman who had, according to her interview report, had spent one month with Mr. Mezaritsky at the villa. And the agent who wrote the report indicated that, in his opinion, this witness had, quote, a great deal of knowledge of the smuggling operation, and that this witness had key information and had also named an attorney in Los Angeles who had been, had contact with Mezaritsky and was involved somehow or may have been involved somehow with the operation. We believe that was a very underutilized source of information. Also, Ozlovsky, who indicated that he was eager to help the investigation, he could provide the location of the villa. He identified Olga Spivak as a person in Kiev who facilitated the travel arrangements. He also identified attorneys in Los Angeles, and he identified two of the Mexican guides who would guide people across the border. Witness Onefranco. The government couldn't get access to some of these foreign sources. It's a practical matter. They had them, Your Honor. They can't bring a subpoena power. They can't bring them before a grand jury. They, they had already arrested them. They were in the United States. That's how. Law offices? Yes, that's how they. The lawyers you're referring to? Well, the, the lawyers were, yes, my recollection is, yes, they were lawyers in Los Angeles, and they identified the names, and I believe in one case, the phone number of the lawyer. And he was under arrest. No, no, the lawyer was not under arrest. The aliens who crossed the border were arrested, and they were the people who were interviewed. Witness Onefranco identified the three Mexican guides by name. Witness Verestuyuk, V-E-R-E-S-T-Y-U-K, she and her son identified for the agents a list of aliens who had been smuggled across. That was all information that was in the reports that were, that was omitted from the warrant affidavit. The government had a wealth of information about, for example, the scope of the operation. They knew the way it worked. They knew that the Ukrainians in Kiev would contact travel agents. They knew the name of at least two of the agencies, Svit Tours, and this, Mr. Oslovsky identified Olga Spivak as the facilitator in Kiev. They knew that the aliens would arrive in Mexico. They were met there. They were taken to the villa in Rosarito. They were prepared to cross the border. Their hair was dyed. They practiced English. They were taken to the border by the Mexican guides. They paid smuggling fees. And then if they crossed the border successfully, they were met in the United States. This was the pattern of the operation. It was the same people were involved, the same way that the smuggling occurred, occurred in virtually most of the cases. And the government argues, actually, or states in the affidavit, besides the fact that these particular witnesses did not have knowledge of the entire scope of the operation, that what they did have was some historical knowledge, but many were afraid to come forth and to your clients, to know that they were cooperating out of fear for their lives. How do you respond to that? Well, I don't recall Ms. Shunovich, the one that had the one-month relationship with Mr. Mazuritsky, indicating reluctance to continue to cooperate out of fear for her life. I don't recall Ms. Kurofsky. They appeared to be eager to assist the investigation based on the interview reports. One of them had monitored phone conversations and appeared to be ready and willing and able to continue their use by the investigators if called upon. So I didn't really see a reluctance on the part of those cooperators. What's also interesting, particularly the one witness who spent a month and developed a close personal relationship with Mr. Mazuritsky, there was another woman who had developed a close personal relationship with Mazuritsky. Her name is Ms. Sverdova. And what's interesting is looking at her interview report, it shows pretty concretely what kind of use or what kind of information could have been obtained if the cooperators had been utilized properly, because she not only identified Mr. Mazuritsky and Ms. Komisarek as leading the operation. She identified Yuri Sarnoff and Mazuritsky as coaching the aliens. She identified, she talked about how Ms. Komisarek would receive the smuggling fees at Western Union. She apparently was with her when that occurred. The fees were then deposited in bank accounts. She actually identified all of the people that went to trial on this case, according to her report. Mr. Chernoff, Valerie Komisarek, the two Latyshevs, and Karlova. So this was a witness who had the relationship with Mazuritsky and, like Shinovich, could have provided information, or Shinovich could have provided information like Sverdova,  otherwise, by the investigation. I mean, the law in wiretap is you don't get a wiretap unless you can show a real necessity for it. There's a real presumption against getting a wiretap. And you don't do it up front. You do it only as a last resort, not as a first resort. Although there was investigation in this case, I think it stopped prematurely. I think they sought a wiretap when they really didn't need it or could have gotten a lot more information using regular investigative techniques short of getting the wiretap. And I think the wiretap, the showing of necessity was not made once you consider the omitted information. So we saw, first of all, a Franks hearing because of the omitted information. That was denied. But when you look at the information that was omitted and consider it in conjunction with what was in the wiretap in the affidavit, the government really didn't show necessity, and they bear the burden. It's sort of a hindsight argument, isn't it? I mean, the government could likewise argue that they had X amount of information to justify, before the district court, getting a wiretap. But after they did get the wiretap, there was tons more information that came out, which was used as evidence at the trial. Your Honor, that's always the case with a wiretap. When you run the wiretap, you then get more information in your investigation. You get what's said in phone calls. And then you take what you then have now developed with the new phone calls, and you get successive wiretaps, or you run the wiretap for another 30 days, another 30 days. But that doesn't go to the main issue of whether you should have been able, whether you properly, legally obtained the wiretap in the first place, and whether you have shown necessity to get the wiretap. It doesn't matter that you got more information later with the wiretap. The question is whether you should have gotten the wiretap to begin with, whether you bore the government met its burden of showing that they needed the wiretap, that they couldn't have gotten the information through normal investigative techniques. And I think that, I mean, you can always, the government can always say, well, we have these six goals of our investigation, and we need a wiretap to meet all six goals. But the Ninth Circuit has, as you I'm sure know, in Blackman and Gonzalez, have addressed this idea and said, look, you can't not, you cannot define a scope that's so large that you can justify a wiretap in every case. You, and you can't, they talk in terms of genetic problems of police investigation. You're not going to always be able to get everything that you need to get a wiretap easily, essentially in every case by simply saying, well, we want to do all of this. You have to have, you know, reasonable goals, and you have to be able to show why what you did try in the case was not sufficient to enable you to obtain the information that you're seeking. And they really did have a lot of information, and they could have obtained a lot more information had they properly, you know, conducted their investigation without first getting the wiretap. And so my time's running down a little bit. I'd like to just address briefly one other issue. This has to do with the asylum, what's so-called the asylum mill evidence, the introduction by the government of false asylum evidence against Ms. Komoserik. They essentially said or introduced evidence that she ran an asylum mill and she created false asylum applications or petitions for herself and some unknown others. This essentially was bad character evidence. The government's justification was that the defense had opened the door in cross-examination. I think that if you look at the record, this really wasn't the case. The record does not support that. First of all, you should note that the subject of asylum was approved by the district court in its order. It said it was relevant to the case, that it could go to the issue of whether the aliens were smuggled for financial gain. Cross-examination was consistent with this order or was consistent or within the scope of the direct testimony. And I should note that the government did not object during the cross-examination. And just very briefly, there were several witnesses that the government complains that the cross-examination opened the door. There was Agent Cotterell, and we elicited his expert opinion about the law of asylum. There was nothing misleading about that. Astakova, we elicited that she came to the United States illegally after trying to get asylum. Nothing misleading about that. Kirovsky, he had friends who came to the U.S. through asylum. Nothing misleading about that. Mr. Chorney, he spoke to Ms. Komoseruk about obtaining asylum. There's nothing misleading about that. And finally, Mr. Chagoff, who testified in direct that he came to Ms. Komoseruk's home around ten times, and they discussed smuggling aliens. Well, in cross-examination, it was elicited that in order to present the full picture to the jury, that during these same ten visits, there was discussion about asylum. And there were people that came with Mr. Chagoff, who asked Ms. Komoseruk some questions about filing asylum petitions, and she made some reference to going to see attorneys to assist them with their petitions. Again, nothing misleading about that. I believe that the government's justification to try and admit this evidence, this bad character evidence, on the grounds that the door was open was because of misleading cross-examination, really is not supported by the facts. This is not a situation where we were trying, we were claiming that Ms. Komoseruk filed truthful asylum petitions for herself or that she had a service where she filed legitimate asylum petitions for others. That wasn't the representation here. If that was the argument at all. And what really happened here is that they were permitted, I think incorrectly, to introduce bad character evidence to impugn her character, because some of that evidence on the tapes were extremely prejudicial about how she would, you know, use information from Jewish cemeteries to create her own false asylum petition, and that, no doubt, created a very negative impression on the jury for her. So I would stop there and reserve the remaining time for rebuttal. Thank you. All right. Thank you. Good morning, Your Honors. May it please the Court. Daniel Saunders, Assistant U.S. Attorney for the Government. Also present with me in court today is AUSA Mark Avis, who co-tried the case with me before the district court and who was with me on the brief before this court as well. With respect to the issues raised by Mr. Lichtman, I'll start first with the wiretap. It is true that the interview reports of witnesses such as Dmitry Oslofsky and Lesya Shunovich included the interviewing agent's opinion that these particular witnesses had a great deal of information. What is important of that to include in the wiretap affidavit? The opinion that they had a great deal of information or the information itself? The information that these material witnesses provided was included in the affidavit. The agent's subjective opinion that this was a lot of information or a little information or more information than somebody else provided really is not what's relevant to the finding of necessity. The finding of necessity and the finding of probable cause depends on the information that the witnesses did in fact provide. That information was included in there. The only arguable mistake in there was with respect to the one witness, Natalia Onofrienko, and this was with respect to her family. What happened in that instance was the affidavit said that or described those Mexicans as three unidentified Hispanic males. In fact, at the time that she was interviewed, that the witness was interviewed, they were in fact unidentified, and to that extent the affidavit was correct. The affidavit did neglect to mention that later on, after these Mexicans, along with the group of smuggled aliens, had been apprehended crossing the border, she was shown photo spreads, including the three apprehended Mexican guides, and she identified them and says, yes, those were the guides. That was arguably an error in the affidavit. There's no establishment. There's no offer of proof. There's certainly no substantial preliminary showing that that error was reckless or was intentional. And as far as the effect that that has on the finding of necessity, the identification of three low-level Mexican guides who guided one particular group of these aliens across the border has really no relation to the necessity with respect to a vast, multinational, multi-continental organization, an organization that had roots in Kiev, that operated in Poland, that operated in Mexico, that operated in Russia, that operated here in the United States, in California, and elsewhere. With respect to the ability to use these type of material witnesses, I think the argument that Mr. Lichtman makes is that the government somehow had an obligation to seek using these witnesses in some type of undercover capacity to re-infiltrate the organization. There's no case law that suggests that the government, before establishing necessity for a wiretap, needs to use civilian witnesses and potentially put them in harm's way and pressure them or use them, even if they're willing to be used, in some type of infiltrating posture as a cooperating witness. We're also talking here about a situation where there really was no legitimate reason for these smuggled aliens to re-contact the organization once they had been smuggled. Tatyana Komissaruk was obviously very suspicious and terminated the call because he wouldn't give her a phone number for her to call him back at. We're not talking here about something like a drug organization where maybe somebody can be sent back in to make additional buys and maybe wear a wire or cooperate with the government. These people had been smuggled. They were done. There was no reason that the government had to use them in some type of covert way is not supported by Blackmun, not supported by, certainly not supported by Canales-Gomez. In fact, directly contradicted by that. And there's really no basis to argue that. Mr. Lichtman pointed out that one other material witness as to whom there is no allegation of omission, Inga Sviridova, identified the seven people who went to trial in the case. Well, the fact is 18 people were indicted in this case, including six people in Ukraine who still remain fugitives. The identification of those individuals, of the entire scope of this organization, was something that was obtained through the wiretap. Each individual smuggled alien may have been able to provide the government with limited information about their own story, about who they met, who they were smuggled by. And as we pointed out in our brief and as the affidavit shows, many of those were by first name only. I met somebody named Olga. I met somebody named Jose. But with respect to uncovering the real organization that was going on, the contacts between Europe and Mexico and the United States, the flow of money, the money laundering, the banking information, the plans for future smuggling incidents that could be smuggled aliens had anything like that information and couldn't have had that information. And therefore, there was no intentional or reckless omission. There was no need for a Franks hearing. And with respect to the necessity finding, a finding that was made by Judge Phillips as to one affidavit, by Judge Reel as to two affidavits, by Judge Pragerson in the review and by Judge Takasugi later on, there was no error in that finding of necessity. With respect to the asylum evidence, I think Mr. Lichtman is somewhat disingenuous when he says there was no attempt to mislead, no suggestion of anything misleading here. We litigated extensively prior to trial the admissibility of evidence relating to political asylum. And we relied largely on Judge Hall's opinion in the Aguilar case, which made very clear that a mistaken belief as to an alien's eligibility for asylum really has no bearing on the liability of the smugglers or of the alien for an illegal entry. That what has to happen in order to have a defense is that alien has to physically present themselves to the INS for an asylum petition before illegally entering the United States. We very quickly established through our first witness in this case that that did not happen with respect to a single one of the aliens named in this indictment. There was no application for political asylum prior to coming into the United States. What the case was, as shown by the wire transcripts, is that these aliens were coached by the organization, specifically by Tetiana Komisaruk, that if they were apprehended, they should then claim that they were applying for political asylum. That was the cover. That was the way to avoid being sent back. The intention, of course, was for them never to be caught. And that's made abundantly clear by the transcripts as well, by Tetiana saying, oh, this shouldn't happen anymore. We've got a new route now. Nobody's getting caught. So how was the evidence of the, quote, unquote, asylum mill relevant to that point? Well, with respect to the admission of asylum evidence, Judge Takasugi's order was very One, to the extent it constituted a defense under Aguilar, which, as I've just pointed out, it didn't with respect to any of the aliens. And the only other purpose for which the evidence could be introduced, for which any evidence relating to political asylum could be deemed relevant, was insofar as it would disprove the element of financial gain, disprove that the defendants were acting for the purpose of financial gain. And I should point out here as well that the law is clear that financial gain need not be the only motive. It needs to be a purpose. One can smuggle for humanitarian reasons and also charge money for it and do it for financial gain, and that would violate the statute. But given that limited purpose for which the asylum evidence was relevant, the questioning of Agent Cotterall for, I think, about ten pages on and on about what it takes to apply for asylum and how you have a credible fear interview and what credible fear means and what the INS does when it's ruling on that type of application, the questioning of the material witnesses, didn't you talk to Tetiana Komisaruk about asylum? Didn't you, in fact, overhear her talking to other people about asylum? It clearly showed, in addition to the pretrial litigation, where the defense was going. And that was, in fact, where the defense went and what their entire closing argument was. These people weren't smuggling for financial gain. These people were smuggling to try to help refugees get political asylum. The money that was paid, that wasn't a smuggling fee. That was a retainer for attorneys. Never mind the fact that the wiretap transcripts and the banking records thoroughly disprove that. But that was the inference that Mr. Lichtman, for his client, Tetiana Komisaruk, was trying to raise with the jury through all this questioning about, didn't she also talk to you about political asylum? Didn't she advise you about political asylum? Didn't she suggest that you apply for political asylum? Didn't she hear her answering other aliens' questions about political asylum? With the only relevance of that evidence under Judge Takasugi's order being that to disprove the financial profit motive, the financial gain motive, then the government was in a position to respond by showing that all this talk about political asylum was yet further evidence of, in fact, a financial motive, that all of this stuff about political asylum was simply evidence of yet a further stage of criminal conduct in this full-service smuggling organization. We'll smuggle you into the United States for a fee. If we succeed in getting you here, we'll perhaps help you commit asylum fraud for a separate fee. That was the nature of Tetiana Komisaruk's involvement in political asylum. And what Mr. Lichtman attempted to do was to raise a misleading impression with the jury that Tetiana Komisaruk was some legitimate person trying to help people out with legitimate asylum applications out of the goodness of her heart rather than somebody smuggling in aliens by the hundreds to line her bank account. And once that impression was created, Judge Takasugi fairly looked at the evidence and said, the government has a right to prevent the jury from being misled to at this point show that, in fact, there was nothing legitimate about that asylum business, about those asylum conversations. She was simply offering to help these aliens commit further fraud for yet another fee. It had nothing to do with the smuggling fee that was paid. It had nothing to do with any legitimate asylum claims. Now, we did not seek to introduce that evidence early in the case. And had Mr. Lichtman not raised the issue in the way that he did, that evidence might well have not been admissible, although I think we could argue that it is inextricably intertwined with the entire smuggling organization. But we also had evidence that other defendants, such as Lorena Latysheva, Tatyana Komisaruk's daughter, was involved in that asylum fraud. We had conversations of her on the wiretap talking about forging asylum documents. We didn't seek to introduce that. She hadn't made it an issue in the case. Mr. Lichtman and Tatyana Komisaruk did. And they made it an issue in the case from the very beginning of the case. And they made it an issue all the way through to closing argument, when Mr. Lichtman, in fact, called me to task and challenged the government for the fact that the government hadn't addressed anything in its closing argument about political asylum, which was the key issue in the case. Now, when a defendant is going to make political asylum the issue in the case and argue before the district court in response to the government's motions in limine over and over again that it is relevant, that it is the key issue to the case, that same counsel cannot jump up and cry foul when the government seeks to introduce evidence to show that, in fact, the defendant's claims about being involved in political asylum were bogus and were simply a further aspect of that defendant's criminal conduct. That defendant brought it into the case, brought it into the case and hammered it home over and over and over with every witness. And Judge Takasugi certainly did not abuse his broad discretion in the admission of evidence by allowing the government in response to raise the truth, to demonstrate to the jury the true nature of Tatyana Komisaruk's involvement with political asylum. There's an issue that was raised in Mr. Lichtman's reply brief that he didn't argue. With the Court's permission, I have a few minutes. I'd like to address the jury instruction issue. And this is the issue of whether there is a conflict between the Ninth Circuit-approved 1324 elements instruction, which requires an intent to violate the U.S. immigration laws, and, excuse me, the Ninth Circuit-approved general knowledge instruction, which states, among other things, that a defendant need not know that his acts or omissions are illegal. As we point out in the brief, it's the government's position that there is no conflict here, because one deals with intent, one deals with knowledge. And the United States v. Nguyen case and United States v. Barajas-Montiel case that required the intent to violate U.S. immigration laws made clear that they were not intending to dispense with the other legal maxim that mistake of law is not a defense to a crime. They simply added a mens rea element to a statute that was silent on mens rea, but with respect to knowledge of the law, that is not required. And that's what the knowledge instruction made clear. But I would submit the Court need not even engage in that type of parsing of the intent v. knowledge requirements here with respect to any conflict in the jury instructions, because even though we believe there was no conflict, it's further clear that even if there was a conflict, that error, any error, was harmless in this instance. Let me ask you about the other. They argue, the defendants argue that there was also an error with respect to the Court's instruction on commingling, Section 1957. Wasn't that, in fact, an erroneous instruction? The commingling, to the extent that it applied to the 1957 counts as well as the 1956 counts, yes, was erroneous, and I look back on the law. That was, however, not only a plain error review, but that was invited error. That was a jointly submitted jury instruction by the defendants as well as by the government. And so the law on invited error seems clear that when a defendant proposes a jury instruction, that defendant cannot then come to the court of appeals and say that instruction was error, when the defendant was responsible for proposing that instruction to the district court. Did the defendant propose it? It was jointly proposed. Defendants signed off on that. There was no objection to the commingling instruction on the ground that it shouldn't apply to the 1957 counts. I believe that the proposed instructions and the defendants' objections to those instructions are included in the excerpts of record, and there was nothing in there that included any defendants' objection to the commingling instruction as it applied to the 1957 counts. But again, with the harmlessness issue, for purposes of that argument, even if the Court does reach review and does review for plain error, and whether that error affected the defendant's substantial rights, there was no evidence introduced at trial of any legitimate funds, any funds from any legitimate source going into those accounts. So the jury didn't need to rely on a commingling theory, and the government didn't need to argue a commingling theory. We need to look We used the word tainted. That was perhaps not the best choice of words in closing argument, but the fact is the bank records that were submitted and the evidence that was presented to the jury showed that those accounts, that account in which Valeriy Komissaruk, the account that he used for the down payment in the 1957 count, was exclusively a repository of alien smuggling proceeds. There was a vigorous attempt at trial by the defense to show a legitimate source going into those accounts by showing these deposits from Escona Traders. The government then came back and matched those deposits from Escona Traders with intercepted calls and intercepted faxes relating to smuggling fees paid on those dates in those amounts. And so we showed that that, too, was simply a cover, a source of smuggling fees. So given that commingling wasn't really an issue in the case, and there was no need to rely on a commingling theory and no evidence of any legitimate funds in that account, or in Tetiana Komissaruk's account, from which a check was drawn into Valeriy's account, there was no plain error, even if the Court does review it, with respect to the commingling instruction. If the Court has any questions on any of the remaining issues, I'd be happy to try to answer them. Are you aware of United States v. Burtt? I'm sorry, v. Burtt? It's left-sided in your brief. It's a case in which the Ninth Circuit cut back on this I do recall that. I think that, yes, when everybody is unaware, and by, I guess, due diligence, should not have become aware of the error, I believe that's in there as well, that there's a limitation on the invited error doctrine. But at best, this would be reviewed for plain error with respect to the commingling instruction. And with respect to whether there was any type of miscarriage of justice or any effect on the defendant's substantial rights, again, given the evidence in the case and given that there was no argument It doesn't affect the government's right and the government's obligation to prove beyond a reasonable doubt every element of the claim. I mean, the defendant doesn't have the obligation to come up with evidence that there weren't commingled plans. You need to come up with evidence that there was and prove it, and the jury should be instructed as to that. And I think we did in this case. I think if the Court looks at the evidence and at the bank records that we included in our excerpts, all of the evidence that the government presented showed that this account was a repository for smuggling fees. The bank statements themselves showed these deposits in round numbers, 2,200, 2,500, 3,000, or multiples of those numbers, which the evidence established were the smuggling fees that the organization charged. The intercepted faxes and telephone calls that were introduced at trial gave instructions to aliens and to their sponsors to wire the smuggling fees into this account. The deposits from this unknown Estona traders in Latvia were directly connected to smuggling fees and were shown, again, through a wiretap transcript, Tatiana Komisaruk saying, all my money, all the smuggling fees come to me through a bank in Latvia. So the government did fulfill its burden, I would submit respectfully, with respect to that element. We showed that that account, that bank account of Valerii Komisaruk, was solely and exclusively a repository of smuggling fees. And the fact that the jury was instructed that they could find guilt on the commingling theory doesn't bear on the defendant's substantial rights because they were also instructed that they had to find that at least 10,000 of that transaction came from specified unlawful activity. And the government proved that every dollar in that account came from specified unlawful activity, that the purpose of that bank account, as well as several other accounts that we traced through the money laundering expert and through the bank records, was as a repository of smuggling proceeds. So we would submit there's no basis for plain error reversal here. If there were, it would go only to that one 1957 count, as to Tatiana and Valerii Komisaruk. It would have no effect on the guideline sentence because there were other money laundering counts, 1956 counts, which would carry the same guideline. But we would submit respectfully that there's no plain error here, even if the Court does reach plain error review. Are there any other issues that the Court would like the government to address? Thank you very much. Concerning the wiretap issue, the government made the argument that the agent's opinion that Ms. Shunovich had a great deal of information regarding the smuggling operation was not something that would go into the warrant. I think the government misses the point. It's not so much that that would go into the warrant. What's important is that this is a potential source who had a great deal of information about the operation, who could have been used to obtain further information about the operation. The government says, well, they had no obligation to use the cooperators and they had lost contact with them. My recollection of Ms. Shunovich's report was that Mr. Mesersky had asked her, when she got to Los Angeles, to have further contact with him. This appeared to be a ripe source of further information. So to omit the fact that a potential cooperator has a great deal of knowledge about an operation from an affidavit is critical information because it goes directly to necessity. If the judge reviewing the application knew that you had a cooperator who was closely related to Mesersky and had a great deal of information, had key information about the operation, that would be something a judge would want to know. That could, as the quote goes in the cases, could mislead an issuing judge in issuing a wiretap order. By not knowing that, I think that's a critical omission. I disagree with Mr. Saunders about the only omission being the identification of the guides. There were other omissions which I elicited, which I stated in response to Your Honor's question earlier. Our position is that the government is not required to use cooperators, but they are required to show necessity. And if cooperators are available to further an investigation, then a government has an obligation to use investigative sources that are available. And these were people that were available that had close relationship, at least Mishunovich, with a main operator, a main person involved in the operation. On the asylum issue, I think what's important to understand is the evidence that the government introduced had mostly to do with Ms. Komoserik's preparation of her own asylum application. And there was reference to the fact that she had done this before regarding unknown aliens. There was no showing, and we mentioned this in the district court, there was no showing that any of the aliens that she may have been involved in false asylum applications were any of the aliens in this particular case that were mentioned in this indictment. So really it created an impression of Ms. Komoserik that was not appropriate under the circumstances. The evidence, the cross-examination that was done of these witnesses, first of all, was not objected to by the government. Second of all, it was consistent with Judge Takasugi's order who made the issue of asylum relevant under certain circumstances. And in order to lay a foundation, we introduced tapes in the defense case, wiretap tapes of Ms. Komoserik's discussing the issue of asylum and the issue of fees. The question, one of the questions at trial was, what were the fees being collected for? And we introduced evidence, which we believe supported our contention, that the fees that were being collected were for purposes of paying attorneys to do asylum petitions, legitimate asylum petitions. And so in order to lay a foundation for that evidence, we introduced a piece of evidence. The jury needed to understand the asylum process. So Agent Cotterall explained the asylum process. And other witnesses, the reality of applying for asylum was elicited from other witnesses who either tried to apply for asylum or knew people that had applied for asylum. There's nothing misleading about that. What the government really did was they showed, with their evidence, that Ms. Komoserik was involved in falsifying her own asylum application. But that had nothing to do with this case, and that didn't offset any kind of impression that was presented to the jury previously. In fact, there was no real impression or certainly no misleading impression that was presented to the jury. The fact that certain witnesses had discussed asylum applications or knew people that had applied for asylum or had applied themselves for asylum. Ginsburg. Well, assuming that that was an abuse of discretion under Rule 403, why isn't it a harmless error? Kneedler. Well, because I think when you attack somebody's character, when it goes, when you're introducing prejudicial information against, and highly prejudicial information, and by the way, the judge has said, if you introduce highly prejudicial information against somebody, I think it affects the jury's impression about their character and about them individually, and it creates animus on the part of the jury towards somebody who you introduce such evidence against. Ginsburg. Does anybody have any other questions? All right, you're over your time, sir. Kneedler. Thank you. Ginsburg. Thank you very much. The case of U.S. v. Letitia Baird et al. is submitted, and this session of this Court is adjourned.
judges: Beezer, Hall, Wardlaw